IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Civil No. 3:23-cv-00384 |
| APPROXIMATELY $29,000 IN UNITED STATES CURRENCY SEIZED FROM EVAN MENARD ON FEBRUARY 17, 2023 AT THE CHARLOTTE-DOUGLAS INTERNATIONAL AIRPORT | ) ) ) ) ) ) |

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

### **INTRODUCTION**

1. This is a civil action *in rem* against $29,000 in United States currency seized from Evan Menard ("Menard") on February 17, 2023 at the Charlotte-Douglas International Airport (the "Currency").

2. After a narcotics detection K9 alerted to Menard's checked bag at the CLT airport, law enforcement found $29,000 in cash hidden among clothes. Menard has claimed he was traveling to California with the money to purchase a vehicle for his "Turo" business (*i.e.* peer to peer carsharing, *see* https://turo.com/) and the Currency was legitimately-derived earnings from this business.

3. But, Menard's story doesn't add up on multiple levels. First, Turo's records plainly reveal it is false—as he only earned about $1,700 prior to the seizure. And, Turo requires electronic payment through its platform, so if the Currency was

actually legitimately derived earnings from car sharing rentals, a clear paper trail showing the $29,000 coming in as rental income through Turo's platform and being withdrawn in cash from some financial institution would exist. None has been provided by Menard or can be found in Turo's records provided to the Government. Indeed, at the time of seizure, though he claimed the Currency was withdrawn from a bank, Menard refused to show law enforcement evidence of such withdrawals in his mobile banking app or provide the names of the individual whose car auction account he was supposedly using.

4. Moreover, if Menard was truly traveling to California to buy a car, it would make little sense to earn the Currency legitimately (incurring no risk from any financial institution reporting or record keeping), withdraw it from a bank somewhere on the east coast (as he claimed he did), rubber band it in bundles (instead of using the bank bands) and risk flying with the cash across the country (a method of cash transportation that is clearly not the safest and most efficient for legitimate currency—putting aside the risk of theft, a mere lost checked bag from the airline would have meant the loss of the majority of it). This is especially true when Menard could have simply flown to California and withdrawn the cash from a bank there if he truly needed it in cash form.

5. Instead, a more simple and plausible explanation exists: Menard, who has a lengthy travel history of taking last minute flights to known drug source locations (at a cost of over $10,000 on such flights in the 11 months prior to seizure) was transporting the Currency for use in narcotics trafficking.

6. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## NATURE OF THE ACTION

7. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

8. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

9. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

10. The Currency has been seized and is now within the Western District of North Carolina.

11. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Task Force Officer ("TFO") Stephen Brown, this action seeks the forfeiture of all right, title, and interest in the Currency.

# FACTS GIVING RISE TO FORFEITURE

*The interdiction*

12. On February 17, 2023, law enforcement at the Charlotte airport was conducting a narcotics interdiction operation on outbound domestic flights to known drug-source locations, which included American Airlines ("AA") flight 1674 bound for Los Angeles, CA.

13. That day, Menard was traveling to Los Angeles on AA flight 1674.

14. The interdiction operation included, among other things, the deployment of K9 Cali, a properly trained and certified narcotics detection canine, to conduct open-air sniffs of checked suitcases prior to their being loaded onto AA flight 1674.

15. K9 Cali positively alerted to a suitcase belonging to Menard. The suitcase was detained and moved to the boarding area for the flight while law enforcement attempted to locate Menard.

16. TFO Brown requested the gate attendant page Menard on the intercom, and Menard approached and identified himself.

17. TFO Brown asked to speak with Menard about his suitcase, and Menard followed him to a more private area of the concourse at a nearby gate.

18. When TFO Brown asked him what the purpose of his trip to Los Angeles was, Menard responded that he was traveling to Los Angeles to buy a car (purportedly a Nissan Altima for his Turo), had been in Charlotte for one day to see a friend, and had stayed at a Marriot-branded hotel near the airport.

19. TFO Brown explained to Menard that he smelled a strong odor of marijuana emitting from his suitcase and a narcotics canine had alerted to his suitcase.

20. Menard advised that he smokes marijuana but there wasn't any marijuana inside the suitcase.

21. TFO Brown requested consent to search Menard's carry-on bag and his checked suitcase, which Menard granted.

22. Four bundles of currency were located in the search of Menard's carry-on bag. Three of the bundles were rubber banded while the fourth was in an open Bethpage Federal Credit Union envelope.

23. When TFO Brown asked Menard how much money he was traveling, Menard initially claimed $15,000.

24. Menard said the money came from a bank account, but was unable to provide proof of the withdrawal transactions. During the interview, Menard appeared to pull up his banking app on his phone, but would not show the app or any transactions (such as the purported currency withdrawals) to TFO Brown, despite requests to do so.

25. In the suitcase, law enforcement found a large vacuum sealed plastic bag containing items of clothing and a large bedsheet, and concealed within these items were an additional eight bundles of currency:



26.     TFO Brown asked Menard for the name of the friend he was visiting in Charlotte. Menard identified her as "Briyella" and showed TFO Brown on his phone that he had texted his Charlotte hotel address to a phone number purported to be hers. However, the phone number was not saved in Menard's phone or associated in his contact information with Briyella—a fact inconsistent with Menard's story that the "Briyella" at that number was a friend of Menard's who he travelled from New York to Charlotte to visit.

27.     Indeed, TFO Brown called the phone number at that time from Menard's phone to verify his story, and the woman who answered initially denied knowing Menard. She eventually stated she knew Menard by another name, did not know where Menard was travelling to and assumed he was going back to New York.

28.     TFO Brown again asked Menard about the amount of currency he was

traveling with, and at this time, Menard admitted the currency totaled $29,000.

29. Menard was also unable to show any information regarding the vehicle he was purportedly traveling to California to purchase, other than to say he planned to attend a Manheim auction.

30. When TFO Brown asked Menard if he looked up the vehicle with the auction site, Menard stated he could not log on because it was not his auction license but the license of his friend's father.

31. TFO Brown asked Menard for the names of the friend and the friend's father who holds the auction license. Menard refused to provide that information.

32. TFO Brown advised the currency was being seized and Menard was provided a seizure receipt and the seizure process was explained to Menard. Menard continued his flight to Los Angeles.

*The Currency's second K-9 alert and deposit*

33. The Currency was subsequently placed into two independent lineups of four scent boxes.

34. K9 Gunner, who is a properly trained and certified drug detection canine, was deployed to conduct a sniff of the blind lineups.

35. As to each lineup, K9 Gunner positively alerted to the odor of narcotics only on the boxes containing the Currency seized from Menard.

36. The Currency was transported to Loomis, where it was counted and deposited into an account established to hold seized funds.

37. All of the bundles of currency found in Menard's carry-on and checked

bags were rubber banded and in multiple denominations consistent with the proceeds of street-level narcotics sales. More specifically, the $29,000 in Currency was comprised of 50 $10 bills, 780 $20 bills, 106 $50 bills, and 76 $100 bills.

*Menard's travel history*

38. Menard's travel history to California is consistent with that of a drug or money courier.[1]

39. California is a known drug source state for the east coast. Airline records reveal that from March 2022 through February 2023, Menard booked twenty-four (24) flights to and from California, reflecting at least 12 round trips by Menard.

40. These flights cost $9,956.87 and 75,000 Delta Sky Miles (according to information from Delta, a value of $755), bringing the total cost for Menard's California travel to Los Angeles in the roughly eleven months prior to seizure to $10,711.87. And, Menard's California trips were purchased either the same day or the day prior to travel, often including short 1-2 day stays.

41. Conversely, Menard booked what appears to be his leisure travel—trips to the Caribbean or Miami—well in advance of the travel.

*Menard's claimed source of a legitimate travel purpose and income—his Turo business*

42. In his administrative claim, Menard asserted the Currency was legitimate income from his car rental business, which he confirmed (by counsel) to be

---

[1] Additionally, after the seizure in question, on April 25, 2023, Menard was found to have arrived in the Los Angeles Airport transporting approximately $20,000 in cash in an almost identical manner—split among his carry-on and a vacuum-sealed bag in his checked bag with minimal clothing. During this encounter, Menard similarly claimed to law enforcement that he was in Los Angeles with the cash to purchase a car, but admitted that he hadn't spoken to anyone about buying car.

conducted through Turo.

43. Turo provides "an online car sharing platform that connects vehicle owners with travelers and locals seeking to book those vehicles. Turo is accessible online including at turo.com and as an application for mobile devices."[2]

44. Turo records indicate Mendard's proffered story regarding the source of the Currency is false: from 02/01/2021 through 02/18/2023, Menard only earned $1,733.89 from renting one vehicle—legitimate earnings well short of the $29,000 in cash he was carrying on February 17, 2023.[3]

45. Moreover, if the $29,000 in Currency was legitimate income from Turo, an easy and obvious paper trail for it would exist, as Turo does not allow for rental payments in cash and instead requires payment for rentals be made electronically using its platform (through credit card, debit card, or Google/Apple Pay).[4]

## FIRST CLAIM FOR RELIEF – THE $29,000 IN CURRENCY
## (21 U.S.C § 881(a)(6))

46. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 45 above as if fully set forth herein.

47. The $29,000 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21

---

[2] https://turo.com/us/en/policies/terms#introduction
[3] Menard claimed to have three vehicles available for rent, and Turo's records indicate a second vehicle has been booked for rental three times only after the seizure, meaning an income from this vehicle cannot be the source of the Currency
[4] https://help.turo.com/en_us/gray-market-transaction-policy-or-hosts-SJOUUNlN5 and https://help.turo.com/paying-for-your-trip-HkumVNgVq

U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

48. Upon information and belief, the following persons may claim an interest in the Currency seized on February 17, 2023:

Evan Walter Menard

*With courtesy copy to:*

Robert Tsigler, Esq.
Law Offices of Robert Tsigler
299 Broadway, Ste 1400
New York, NY 10007

**CONCLUSION AND PRAYER FOR RELIEF**

49. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 28th day of June, 2023.

> DENA J. KING
> UNITED STATES ATTORNEY
>
> /s/ Seth Johnson
> J. Seth Johnson
> Texas Bar No. 24083259
> Assistant United States Attorney
> Suite 1650, Carillon Building
> 227 West Trade Street
> Charlotte, North Carolina 28202
> Telephone: (704) 338-3159
> Email: seth.johnson@usdoj.gov

# **VERIFICATION**

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the ____ day of June, 2023.

_____
Task Force Officer Stephen Brown
Department of Homeland Security,
Homeland Security Investigations